[Civ. No. 19519. First Dist., Div. One. June 23, 1961.]

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), Respondent, v. HOMER T. CRAIG et al., Appellants.

Lewis F. Sherman and Sherman, Coward & MacDonald for Appellants.

Samuel B. Stewart, Theodore Sachsman and Eldon C. Parr for Respondent.

TOBRINER, J.—The trial court in this case reformed a continuing guaranty to respondent bank for payment of a named corporation's "indebtedness," which the instrument defined as liabilities of the corporation "heretofore, now, or hereafter made, incurred or created," which "shall not exceed at any one time the sum of" $20,000. The court found that the parties intended the guarantee to apply only to the overdraft of the corporation contemplated when the parties executed the guaranty and that its $20,000 limitation did not bar the bank from recovering upon two notes previously guaranteed by appellant Craig. Since the facts sufficiently support the court's conclusion, we uphold the judgment.

We outline the history of the case. On December 7, 1956, H. E. C. Corporation executed and delivered to respondent two promissory notes, one for $6,500 and the other for $5,466.65. Appellant Craig and defendant Hancock, prior to the delivery of the notes, "endorsed and guaranteed" their payment. At the time of trial there was due upon the two notes $6,500 and $1,293.74, plus interest.

Schoenweiler, the loan officer of respondent bank, testified as to his recollection of the events culminating in the signing of the continuing guaranty. In a telephone conversation on or about January 4, 1957, before any overdraft occurred, Craig requested that the bank allow the corporation to overdraw its account and asserted that he would "take the full responsibility for the overdraft and . . . sign any document or do anything that was necessary for him to give . . . [the bank] protection." The parties did not at the time fix a specific amount for the guaranty. Nor was "there any discussion during this telephone call of other indebtednesses that were due from H. E. C. Corporation to the Bank of America." The parties, likewise, did not discuss the two notes.

Subsequently, the corporation overdrew its account and on January 21, 1957, Craig again promised to sign a document to protect the bank "on the overdraft up to $20,000." The total indebtedness of the corporation to the bank on January 22d, was "approximately $200,000. . . ."

On January 22d, Craig signed the continuing guaranty and a letter, addressed to the bank, prepared by Schoenweiler. Mrs. Craig signed both documents. The "Continuing Guaranty," drawn by respondent, provided that appellants guaranteed payment of "any and all indebtedness of HEC Corporation" and defined the word "indebtedness" to include "any and all advances, debts, obligations and liabilities of" H. E. C. Corporation "heretofore, now, or hereafter made, incurred or created" which "shall not exceed at any one time the sum of" $20,000.

The January 22d letter to the bank read: "At the request of and predicated upon the responsibility of the undersigned, you have and are overdrawing the commercial account of HEC Corporation. In consideration thereof, a written Continuing Guaranty guaranteeing the indebtedness of HEC Corporation for $20,000 is on this date executed." Schoenweiler stated that the reasons for procuring the letter, in addition to the guaranty, were "the fact that there was a delay in the

actual signing of this document [after the overdraft commenced] . . . and to have it for the record that this was created—the only reason we went into this overdraft was because of Mr. Craig's request and his backing" and "to make sure that this applied to the overdrafts only." Schoenweiler also agreed at that time to send the Craigs a letter indicating that if Craig "got replacement . . . his liability would decrease."

On the following day Schoenweiler accordingly wrote a letter to Craig, which Craig did not answer, saying: "In connection with the Continuing Guaranty for $20,000 in favor of HEC Corporation signed by you and your wife yesterday, it is understood that this guarantee is taken in connection with HEC Corporation's overdraft. Naturally, as the overdraft reduces and/or guarantees supported by acceptable collateral are obtained, your responsibility in connection therewith will decrease."

Craig's testimony does not differ from Schoenweiler's in any important aspect. Craig remembered speaking with Schoenweiler, on or about January 15, 1957, and asking his patience on the corporation's overdrafts. Then on January 21, 1957, he called Mr. Schoenweiler and "stated to him that I would like to come into the bank and make whatever arrangements were necessary so that the bank would be in a position to honor this back overdraft which I had to assume was fast going to turn into a bank overdraft." They did not discuss at any time prior to January 22d the terms of any documents, the possibility of signing any letter, or whether a document would cover only the overdrafts or all debts.

On cross-examination Craig summarized his conversation of January 21, 1957: "I said to Mr. Schoenweiler that I would come into the bank and make whatever arrangements were necessary to permit the bank to honor an overdraft with H. E. C. Corporation up to $20,000. . . ." Neither he nor Mr. Schoenweiler mentioned the notes at the time he signed the documents; nor did he question the reason for the letter in addition to the continuing guaranty.

Mrs. Craig testified only that she had not wanted to sign the documents at all, but that the $20,000 limit was the "important part" of the document to her. She did not know that her husband had endorsed notes for the corporation.

On August 14, 1957, "an overdraft existed . . . in the sum of $20,627.77." Appellants paid $5,000 which was applied

toward the balance of the overdraft. Subsequently, appellants, "through their attorneys, forwarded to . . . [respondent] a check in the sum of $15,000.00" "with the stipulation that the payment . . . would extinguish liability on the continuing guaranty and said endorsed notes"; respondent returned the check "with a statement that it could not be accepted in full settlement. . . ."

In this action respondent sought recovery of $15,000 on the continuing guaranty as well as the balance and accrued interest on the two notes; respondent also requested reformation of the continuing guaranty instrument to indicate that the $20,000 guaranty applied only to "the indebtedness of H.E.C. CORPORATION arising out of any overdraft now existing, or hereafter created. . . ." The trial court found that "[i]t was the intent of . . . [respondent] and . . . CRAIG, that said continuing guaranty guarantee payment only of the overdraft of H. E. C. Corporation"; the court, therefore, reformed the document accordingly. The court also granted respondent judgment on the balance under the two previous notes plus interest, $15,000 on the continuing guaranty, attorneys' fees, and costs.

The issue crystallizes into whether the evidence sufficiently supported the finding that the parties intended to limit the guaranty to cover only the overdraft of H.E.C. Corporation. Our task divides into an initial determination of the nature of proof required for the reformation of a surety contract for mistake and a succeeding analysis of the nature of review of a judgment which so reforms such a contract.

As to the first, the court may reform a surety contract to effectuate a common intent of both parties which was inadvertently transcribed. Section 3399 of the Civil Code provides: "When, through . . . mutual mistake of the parties, . . . a written contract does not truly express the intention of the parties, it may be revised, on the application of a party aggrieved, so as to express that intention. . . ." As *Lemoge Electric* v. *County of San Mateo* (1956), 46 Cal.2d 659 [297 P.2d 638], states: "The purpose of reformation is to correct a written instrument in order to effectuate a common intention of both parties which was incorrectly reduced to writing." (P. 663.) That the instant contract composed a suretyship relation does not exclude it from the general rule that it was subject to reformation if it did not thus express the common purpose of the parties. (*Bank of America* v.

*Granger* (1931), 115 Cal.App. 210, 217-218 [1 P.2d 479].) Nor does *Bank of America etc. Assn.* v. *Kelsey* (1935), 6 Cal. App.2d 346 [44 P.2d 617], cited by appellants, hold to the contrary. There the bank sued to recover on a written guaranty and also sought reformation of the agreement on the ground of mutual mistake. At the trial "the court granted a nonsuit as to the first cause of action [reformation] *for failure of proof of mistake* in the making of the guaranty agreement, and no error is claimed in respect to such action." (P. 349; emphasis added.) That case does not apply since the trial court here did find proof of mistake and ordered reformation.

If then the court may, under certain circumstances, reform a surety contract, we turn to the determination of the kind of proof required for such reformation and the role of the appellate court in ascertaining if that requirement has been met.

As to the nature of the showing, we reject at the threshold appellants' argument that the court can look only to the involved documents to determine the intent of the parties. If such were the case, of course, the parties could never reform a writing even though it admittedly issued from their common mistake and clearly failed to express their common purpose. The reformation, however, requires clear and convincing proof. ▪ As the court stated in *Moore* v. *Vandermast, Inc.* (1941), 19 Cal.2d 94 [119 P.2d 129] : "[W]here one seeks to reform a written instrument by the introduction of extrinsic evidence, the courts have generally required clear and convincing proof, or something more than a preponderance of the evidence, as the basis for such an invasion of the parol evidence rule." (Pp. 96-97.) ▪ "In the absence of clear and convincing evidence to the contrary, a written instrument is presumed to express the true intent of the parties. [Citations.] This is particularly true where . . . the instrument was drafted by an attorney representing the party seeking to alter the terms of the written instrument." (P. 98.)

▪ The rule requiring clear and convincing proof, however, refers to evidence satisfactory to the trial court; the early case of *Home & Farm Co.* v. *Freitas* (1908), 153 Cal. 680, 684 [96 P. 308], quotes from *Sullivan* v. *Moorhead* (1893), 99 Cal. 157 [33 P. 796], to the effect that a " 'mere conflict of testimony as to the mistake does not necessitate a denial of the relief [citations], and the decision of the trial court upon such conflict of evidence is conclusive upon this [appellate] court.' " (To the same effect: *Vecki* v. *Sorensen*

(1954), 127 Cal.App.2d 407, 414 [273 P.2d 908]; *California Packing Corp.* v. *Larscn* (1921), 187 Cal. 610, 613 [203 P. 102].) ▇ Thus the finding of the trial court that the written instrument requires reformation will stand at the appellate level if sufficient evidence sustains that conclusion.

▇ We believe the record sufficiently supports that conclusion. As the trial court set forth in its memorandum opinion: "It is clear from all of the testimony that the continuing guaranty of January 22, 1957, related only to the overdraft and that this was the understanding of both Craig and the bank. This is further borne out by the testimony of the assistant manager of the bank that when Craig first discussed the need of funds on January 4, 1957, that the bank could not handle an overdraft without adequate collateral. He testified that Craig advised him that it would be inconvenient for him (Craig) to pledge his securities at that time as they were in the hands of his broker, but that he would sign a guaranty for the amount required. This testimony was not denied by the defendants."

Despite the legal strength of the bank's document, consisting of a self-drafted contract which must be interpreted against it, the trier of the facts could not be blinded by it to the actual transaction. Ample evidence supports the court's finding that the procurement of the continuing guaranty, which sought a new and further protection to the bank for a new and further overdraft, was not intended as a limitation of appellant Craig's liability covering the previous endorsements. Any such design would be inconsistent with the substance of the transaction itself.

Salient factors in the evidence which support the judgment and show the incompatibility of the document with the objective of the parties lie in the fact that Craig agreed to take full responsibility for the overdraft and "would sign any document or do anything that was necessary for him to give ... protection"; Craig's agreement to "come in and sign guarantees to cover the indebtedness, to cover the overdrafts"; Craig's statement that he would "come in as soon as possible to sign whatever was necessary, to protect us on this overdraft"; the specification in Schoenweiler's letter of January 22, 1957, to the overdrawing of the H.E.C. Corporation's commercial account but to no other indebtedness of the corporation; Schoenweiler's statement that the purpose of the letter was "to pinpoint this, to make sure that this applied to the

overdrafts only''; Schoenweiler's testimony that that letter was ''taken because we wanted to fix it [the continuing guaranty] to the overdraft only''; the specification in the bank's letter of January 23d that ''it is understood that this guarantee is taken in connection with HEC Corporation's overdraft''; and the complete absence of discussion of any type that limitation of the guarantee applied to, or included, the notes.

In view of such testimony as this we cannot hold that the record does not support the findings of the trial court. Nor do the cases cited by appellants throw any doubt upon its conclusion. Each of such cases, *Bank of America etc. Assn.* v. *Sage* (1936), 13 Cal.App.2d 171 [56 P.2d 565]; *Lytle* v. *Allison* (1913), 22 Cal.App. 35 [133 P. 999, 1000], and *Bank of America* v. *Pauley* (1953), 119 Cal.App.2d 355 [259 P.2d 714], involved actions seeking recovery pursuant to litigated instruments rather than their reformation; the decisions thus turn upon the construction of the words of the documents. Indeed, *Sage* merely held that because a guaranty fixes a limitation upon the amount covered, it does not become void because the involved bank lent the borrower an amount in excess of such limitation.

As a subsidiary point, appellants contend that the court committed prejudicial error in not finding the intent of Mrs. Craig as to the limitation of the continuing guaranty to the overdrafts. In the first place, since the court did not reform the continuing guaranty as to Mrs. Craig, its finding as to her intent would not normally be necessary. Appellants, however, claim that in the case of a reformation ''the intention of all parties must be found'' and that the court should have rendered a finding that she intended to limit her ''total liability to $20,000.00, including liability on the two notes.'' Yet the reformation of the guaranty was not in issue as to her.

In any event the failure to render a finding upon her intent worked no prejudice. The overdraft, on August 14, 1957, amounted to $20,627.77. If Mrs. Craig's liability on the continuing guaranty were not limited to $20,000, she would be responsible for the excess amount of $627.77. The court, however, held her liable only for $15,000, the amount unpaid after the $5,000 payment.

There is no point in our discussing appellants' contention that the trial court erred because it did not ''exonerate appellants when as sureties they made a valid tender of the amount due'' since we have upheld the reformation of the instrument.

The reformation would relate back to the date of the contract (*Ward* v. *Waterman* (1890), 85 Cal. 488, 505-506 [24 P. 930]); the offer of $15,000 would not constitute a tender of the amount due; appellants could not claim exoneration.

Neither do we find it necessary to analyze respondent's alternate theory that Craig was liable on the continuing guaranty without reformation in view of our conclusion that the trial court properly reformed the continuing guaranty.

The key issue here turned on the facts, and, as we analyze the case, the facts sufficiently support the judgment.

We affirm the judgment.

Bray, P. J., and Duniway, J., concurred.